No. 565

First Circuit

———

BERNARD v. CITY OF LAFAYETTE

———

(March 5, 1930. Opinion and Decree.)
(April 14, 1930. Rehearing Granted.)
(January 26, 1931. Opinion and Decree on
Rehearing.)

———

A. W. Dalfares, of Lafayette, attorney for plaintiff, appellee.

George W. Lessley, of Lafayette, attorney for defendant, appellant.

ELLIOTT, J. Antheole Bernard alleges that while in the pursuit of his regular

business as an employee of the city of Lafayette as water line helper, a pipe which he was carrying fell on his left leg causing injury to the shin bone. That the accident occurred on or about January 20, 1927.

That he was receiving at the time a weekly wage of $15 per week, and was by said injury totally disabled. He claims of the city of Lafayette, as compensation on account of his injury and disability, 65 per cent of his weekly wages, not to exceed 300 weeks.

That he has since the accident been under constant care of a doctor, and is therefore entitled, in addition, to $250 for hospital service and medicine.

An exception was filed by defendant that plaintiff's petition did not disclose a right or cause of action. The minutes of the court do not show that it was acted on in the lower court. It is not urged in this court; we therefore look on it as having been abandoned.

The principal defense is that any injury or disability which the plaintiff presently suffers from is due to a long-standing form of eczema, and not to injury received in its employ.

Due to the conclusion at which we have arrived concerning the defense mentioned, which involves the merits of the case, it is not necessary to consider or act on the further defenses urged in the answer.

The lower court rendered judgment in favor of the plaintiff, awarding him compensation at the rate of 65 per cent on his weekly wages during the term of his disability; not to exceed 284 weeks, and $250 for medical fees.

Defendant has appealed.

Plaintiff states that his work consisted in putting in pipe lines, digging ditches, laying water pipes and mains. Asked to explain what he was doing and how the accident happened, when he scratched or cut his left leg, he answered in effect as follows: "I was working on pipes weighing about 3 or 4 hundred pounds and one of them slipped and the iron part struck my left leg below the knee about 6 inches. I did not think it was very much. On Sunday night at 12 o'clock it woke me up and when I wanted to get up Monday morning I could not stand on my leg." He further testified that he was told to move the pipe by Joe Mouton, foreman, in the employ of the city, and under whom he was engaged in the work. That he was hurt on Saturday evening about 20 minutes of 4, near quitting time. That he returned to work Monday morning, but that about 8 o'clock, Joe and Ulysse Mouton, who had gone to run a line, got back and he was sitting on a box. When he got up he could not stand very well. Ulysse Mouton asked what was the matter, and he answered, Saturday where that pipe struck him his leg was stiff.

"Q. Did you return to work for the City after that time?

"A. I returned in 3 or 4 days, I do not remember exactly. I had treated my leg and I was still limping, but I returned to work.

"Q. Tell the court just how that sore grew for the first two or three months after the accident.

"A. After the accident eruptions began growing out around the sore, and then it went up.

"Q. How long after the accident you first noticed these little boils around this sore?

"A. About 8 or 10 days after they began to come out, pimples and little heat eruptions."

Plaintiff's statement as to how he received his alleged injury leaves uncertain

what he was really doing. He says he was working on the pipe; but if in lifting it, it slipped and fell, and his ankle was pressed against it so hard as to get scratched in the fall, the falling pipe would almost necessarily have mashed his foot. But there is no claim that his foot was injured. Then again, his ankle, being likely shielded by his clothing, did not come in contact with the iron, unless he had his pantaloons rolled up, and there is no contention that the naked skin was exposed to the iron. And if his naked skin did not come in contact with the iron, there could not have resulted an infection from it, as he claims. His testimony does not support the averment in his petition that his shin bone was injured. He claims nothing further than a scratch on his ankle.

Joe Mouton was not present at the time of the alleged injury, but remembered that plaintiff told him about it, he thought, on the next day after the alleged accident; but the next day was Sunday and he did not see plaintiff until plaintiff returned on Monday morning. It was therefore on Monday morning that plaintiff told him about it. He says that he looked at the alleged injury received on the previous Saturday and that it consisted of a scratch on his leg, which was kind of swollen and red, not in very bad condition.

Ulysse Mouton testifies that plaintiff told him about receiving an injury to his leg. This witness thought it was the next day after the alleged injury that plaintiff told him about it, but the next day was Sunday. It was on Monday when plaintiff returned to work, he told him about it and showed him the place. Witness states that it was just a little scratch.

An insurance agent called to see plaintiff to pay him some insurance. The exact day does not appear, but evidently about a week after the alleged injury. The witness, speaking of plaintiff's leg at the time he first saw it, says that it had a scratch on it about six inches long, with redness around it.

Mrs. Bernard, wife of plaintiff, speaking of the injury when plaintiff reached home the evening it was received, says he had gotten hurt and had a bruise on his leg. She treated it and he returned to work.

Dr. J. O. Duhon examined plaintiff about three months after the alleged injury. At that time plaintiff's whole body was covered with eczema. This physician says that the form of eczema with which plaintiff is afflicted commences over a long period of time in the system and gradually develops until in its natural course it manifests itself. That it is caused by a microbe and, with reference to plaintiff's case, he did not know what brought it about. That a person with an abrasion on his leg, working in mud and water, would be subject to infection, but might just as likely have gotten it shaving himself. That it is not necessary that there be an abrasion of the skin in order to bring on eczema; that it could be caused by nervous trouble, and in other ways.

Dr. Clark, appointed by the court to examine plaintiff at the time of the trial, returned that he found his leg and ankle dry and scaly, with isolated spots of eruption and scratch marks over the surface. That papules and scratch marks were present over his whole body, especially his extremities. He was unable to say whether the condition of the plaintiff was caused by any previous injury or not.

Dr. Oliver had also examined plaintiff, and he said, basing his opinion on the

history of plaintiff's case, that infection had existed a year or less. But without the history, he could not tell how long it had existed. That observation of plaintiff's disease indicated that it had existed about a year at the time of his examination, which was in November, 1927.

Returning to plaintiff's testimony that he returned and worked three or four days, but was at the time still limping. The evidence shows that on his return he worked at least one day repairing a broken pipe line. The pipe line was laid in a ditch under the ground; this ditch contained water from the broken pipe. The evidence shows that the water in the ditch in which plaintiff worked was the same that the citizens of the city of Lafayette used for household purposes. It will be assumed to have been, and undoubtedly was, pure water. But it may be, we think, also safely assumed that there was some soil in the ditch which the water transformed into mud, and there is evidence that working in mud and water may result in an infection, or aggravate an existing condition.

But it was three weeks or a month after plaintiff's alleged injury before he returned and worked in the ditch. He was questioned about the result, and replied:

"Q. Tell the court what happened to that left leg after this day's labor that you performed for the city of Lafayette, that you just described?
"A. The next day I could not return to work, my leg was hurting me too badly.
"Q. Did your leg get better or worse after that?
"A. Worse."

Under the law disease must be traceable to an accident before it is compensable.

The burden of proof is upon the plaintiff to show that the scratch exhibited to Joe and Ulysse Mouton Monday morning was received in the way alleged, that the disease with which he is suffering grew out of this scratch, or that same was thereby activated into the form in which it incapacitated him.

The fact is eczema is an itching disease producing in the sufferer an uncontrollable desire to scratch himself. Plaintiff had scratches all over his body.

The evidence leads to the conclusion that, while the incapacity which plaintiff suffered may possibly have resulted as claimed by the plaintiff, or a dormant eczema already existing in his system may have been in that way activated and aroused to virulence, yet it is indicated, with equal or greater force, that it existed in his system previous to the time of his alleged injury, and became virulent as the result of its own natural development.

He does not claim in his testimony that working in a ditch containing water from a broken main, after he returned to work about three weeks or a month after his alleged injury, did more than make an existing condition worse.

It cannot be insisted that plaintiff left home well in the morning and returned injured in the evening, because the disease with which he suffers may have been in his system, unknown to him, for months before the time of the alleged injury.

The word "accident" is defined in the Employers' Liability Act, Act No. 20, of 1914, sec. 38 (amended Act 38 of 1918) as follows:

"'Accident,' as used in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening, suddenly or violently, with or

without human fault and producing at the time objective symptoms of an injury.

"The terms 'Injury' and 'Personal Injuries' shall include only injuries by violence to the physical structure of the body and such diseases or infections as naturally result therefrom. The said terms shall in no case be construed to include any other form of disease or derangement, howsoever caused or contracted."

It is not shown that the eczema with which the plaintiff is infected is the natural result of an accident received as alleged, nor that an existing condition in plaintiff's system was thereby activated into virulence.

The judgment appealed from herein is erroneous and contrary to the law and the evidence.

The judgment is therefore annulled, avoided, and set aside, and plaintiff's demand is refused and set aside.

LECHE, J., not participating.

———

## ON REHEARING

MOUTON, J. Plaintiff, an employee of defendant city, was working under Joe Mouton, foreman on the water line. Plaintiff was engaged in digging ditches and laying pipe lines and mains for the city. He testifies that, while handling pipes weighing three or four hundred pounds, one of them slipped, the iron part striking his leg about six inches below the knee. He says he did not believe when he was struck, that it was a serious injury, but that on Sunday night, which followed the evening of the accident, he was awakened by the effects of the injury, and on Monday morning he could hardly stand on his leg.

Joe Mouton, under whom plaintiff was working, saw his leg a day or two after the accident. He says the skin was scratched, that it was red, the leg kind of swollen, but was not then "in very bad condition." Further, on cross-examination by counsel for defendant, he says the skin was broken a little bit, just a scratch. He says he reported to Mr. Ard, his superior in the service of the city, that plaintiff had suffered a scratch on his leg from a piece of pipe, and was not able to work.

Ulysse Mouton, an employee of the city, says he saw plaintiff's left leg where he had received the injury; that he had a scratch there, not very long, about two and one-half inches.

It was therefore clearly shown, and of which there is no contradiction, that plaintiff had received an injury by the falling of a heavy pipe on his left leg, which had resulted in a scratch and broken skin of about two inches in length. This injury was suffered on a Saturday evening, and, when plaintiff returned Monday following to his work, his leg was stiff, and he was advised by Joe Mouton to go home.

Three or four days thereafter plaintiff testifies that he returned to his work; that he was then limping, and there is no evidence, it is proper to remark, contradicting the foregoing statement. His testimony is that in fitting a piece of pipe to another he got wet by standing in mud and water during the whole day before he was through with the job. The day after, he testifies, he could not go back to work, as he was suffering too much from his injured leg. It is true that, on cross-examination by defendant, plaintiff said that the water that came into the place where he was laying the pipe was from the city water mains, and was clear. The fact remains, however, that he was working in mud and water during a full day with a leg upon which he had an abrasion of the skin.

Plaintiff says about eight days after the accident pimples and little heat eruptions began to grow out around the sore or bruise on his leg.

His wife testifies that the eruption started from around the bruise.

J. C. Chargois says he visited plaintiff at his home about five or six days after the accident; that plaintiff exhibited his left leg, and that on the "side of the skin" the skin was off; that it was inflamed, red, and swollen. Chargois is certain that on that visit, which was his first, plaintiff had no eruption on his hands or body at that time. He says, two or three months after, when he returned on his second visit, plaintiff had developed an "eczema all over his legs and hands."

This testimony of Chargois, a witness altogether disinterested as far as the record discloses, shows that at his first visit—which occurred after plaintiff had worked in mud and water in laying a broken pipe —that the eruption was on the leg around the spot where the injury had been inflicted. His testimony in that respect, on a point quite important in the solution of this case, is corroborated by the testimony of plaintiff and of his wife that the eruption began to spread from the sore or bruise on his leg. It is shown by the evidence that these pimples or sores in the course of a few months had gradually spread, covering the hands, legs, and, in fact, the whole body of the plaintiff.

This growth or rash, as described by the witnesses, started or began from the scratch or broken skin on the left leg, which obviously was the point of infection.

Three physicians testified in the case, Drs. Duhon, Clarke, and Olivier. The examinations by these physicians of plain-

tiff's trouble were made several months after the accident, when the eczema or rash had covered the body of the plaintiff, and not at a time when they could have given expert testimony in reference to the origin of the disease.

Dr. Duhon says that the affection of which plaintiff was suffering begins by an infection caused by a germ, and that a person with an abrasion on his leg would be subject to an eczema.

Dr. Olivier says that he found plaintiff was suffering from an exudative eczema which was most probably caused by some broken or slight abrasion of the skin surface. In such cases, he says, that the cause is not internal, but is specific and external.

Dr. Clarke, expert appointed by the court says that it is possible for a person with a bruise or scar exposed to mud and water to develop the condition in which he found plaintiff when he made his examination. There is nothing in the testimony of Dr. Clarke that contradicts the testimony of the two other physicians in reference to the probable origin or cause, of the trouble, which finally incapacitated plaintiff from pursuing his usual work as a common laborer.

It is shown by the testimony of the medical experts that skin diseases may have their origin in various causes, even in some instances from nervous affections, as was stated by Dr. Duhon.

It is shown overwhelmingly by the evidence that prior to the injury plaintiff was and had always been in fine health, was strong and robust, and a reliable, efficient laborer. The very fact that when hurt he was handling iron pipes weighing three or four hundred pounds indicates with cer-

tainty that he was at that time strong and fully competent to perform the services for which he was employed.

It is singular, and indeed passing strange, that, if the eczema of which he complains had had its origin from some invisible internal cause, arising from nervousness or such like, there had never been any indication that he carried in his system a trouble of that character. Usually, nature gives a warning by some symptom or other of an approaching disease. There should have been, it seems to us, some premonition of the coming trouble. If he really had such a dormant disease in his system, it is again very singular that it should have, immediately after the accident, started to grow from the point of injury and from there spreading over his whole body.

It is known today by laymen, and which is not disputed by the physicians who testified in this case, that practically all diseases are caused by microbes, bacteriae, or germs. It is also known that, when water, whether from city mains, clear or not, is mixed up with the dirt of ditches or streets, that mud, the result of it, may at any time be saturated with microbes or germs which may bring about different forms of diseases, and exceedingly virulent in character.

If plaintiff was not affected with the trouble when he first received the injury we think the proof shows with sufficient legal certainty that, after his exposure to the mud in laying the pipe, he was infected with microbes or germs which laid concealed there.

We say so because, as appears from plaintiff's evidence, that of his wife, and of Chargois, who has no interest in the outcome of this suit, after he had worked in laying that pipe, which was three or four days after the day he was injured, the eczema was spreading from the sore on his leg, over his hands and legs, and which finally covered his whole body. On this, the crucial point in the case, let us see what the Compensation Law, Act No. 38 of 1918, p. 49, sec. 38, says on this subject.

In describing the meaning of the terms "injury" and "personal injuries," section 38 says:

"The terms 'Injury' and 'Personal Injuries' shall include only injuries by violence to the physical structure of the body and such diseases or infections as naturally result therefrom."

There can be no doubt that plaintiff suffered violence to the physical structure of his body in the break or abrasion of his skin which is a structural part of the human body. The statute in the section quoted above further says that in the term "personal injuries" shall be included "such diseases or infections as naturally result therefrom," which has direct reference to injuries by violence to the physical structure of the body, of which as heretofore shown, plaintiff was the victim.

How is it possible to say otherwise than that the infection, which started at the sore spot on plaintiff's leg, gradually spreading over his whole body, was the natural result of violence to his physical structure as appeared in the broken skin on his leg and by reason of exposure to the mud in the ditch where lurked microbes, bacteriae, or germs brought about the eczema or skin disease of which he complains. This is the only reasonable inference to be deduced from the facts of this case. It is sufficiently convincing to entitle him to recovery of which he should not be denied, because of the possibility that some other mysterious cause for the origin of his trouble might have lain con-

cealed in his system. The law could not require that plaintiff should also show that his trouble did not originate from some other cause of which there was no appearance or the slightest indication. The right to recover, which we find plaintiff entitled to, is not based on the rule of liberal construction of the Compensation Law in favor of the employee which has been uniformly recognized by our courts. In matter of proof, the same rule prevails in this as in ordinary cases by which plaintiff is always required to make out his case with legal certainty. We find that he has discharged that burden effectively, and, after a re-examination of this record, have found that our original judgment was erroneous, and that the district judge was correct.

It is therefore ordered, adjudged, and decreed that our original judgment be avoided and reversed; and that the judgment appealed from be affirmed, with costs.

ELLIOTT, J. (dissenting). The facts of this case are truly stated in the original opinion. The former opinion, as does the opinion on rehearing, mentions the provisions of Act No. 20 of 1914, sec. 38 (amended by Act No. 38 of 1918), but overlooked to mention the further provisions of section 18, subd. 4 (amended by Act No. 85 of 1926), to the effect that:

"All compensation payments * * * shall mean and be defined to be for injuries and only such injuries as are proven by competent evidence, of which there are or have been objective conditions or symptoms proven, not within the physical or mental control of the injured employee himself."

I think the original opinion of this court herein correct, and dissent from that on rehearing for the reasons stated in the first opinion.